Laurence M. Rosen, Esq. (SBN 219683)
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: 212.686.1060
Fax: 212.202.3827
Email: lrosen@rosenlegal.com
Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHONY DELAROSA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STATE STREET CORPORATION, JOSEPH L. HOOLEY, EDWARD J. RESCH, and MICHAEL W. BELL,<br><br>Defendants. | **Case No: 1:17-cv-11155-NMG**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Marlene Konkoly ("Konkoly") and named Plaintiff Anthony Delarosa ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding State Street Corporation ("State Street" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of State Street between February 27, 2012 and January 18, 2017, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. This action stems from two fraudulent schemes committed by State Street against its clients. State Street incorporated the ill-gotten gains from those frauds into its revenues and profits, and failed to disclose as liabilities the money owed to clients for engaging in that fraud. First, over a period of 18 years, State Street knowingly and systematically overcharged customers for fees on the SWIFT system, taking a profit while claiming that they were merely passing expenses along. Second, State Street deliberately overcharged large institutional clients in the "transition management business" – referring to the business of transitioning into and out of large investment positions. Defendants reported the illicit profits of these two unlawful ventures in its financial statements throughout the class period, deceiving investors about its true financial performance.

## JURISDICTION AND VENUE

3. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

5. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and maintain offices in this district, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

6. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7. Konkoly, as set forth in the previously filed Certification, purchased State Street securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

8. Delarosa, as set forth in the previously filed Certification, purchased State Street securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

9. Defendant State Street, through its subsidiaries, provides a range of financial products and services to institutional investors worldwide. The Company is incorporated in Massachusetts and its principal executive offices are located at One Lincoln Street, Boston, Massachusetts. The Company also maintains offices at 1801 Century Park East, Suite 1440, Los Angeles, California

90067-2316. State Street's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "STT."

10. Defendant Joseph L. Hooley ("Hooley") has been the Chairman of State Street since January 1, 2011, and has been its Chief Executive Officer ("CEO") since March 1, 2010. Hooley signed the company's annual and quarterly reports throughout the Class Period, and according to his certifications accompanying with each annual report, reviewed each report filed by State Street, designed internal control procedures or caused such procedures to be designed under his supervision, and evaluated their effectiveness.

11. Defendant Edward J. Resch ("Resch") served as Executive Vice President of State Street from 2002 until September 30, 2013. Defendant Resch served as Chief Financial Officer ("CFO") of State Street from 2002 to August 2013. Resch signed the company's annual and quarterly reports throughout his term of employment as CFO, and according to his certifications accompanying with each annual report, reviewed each report filed by State Street, designed internal control procedures or caused such procedures to be designed under his supervision, and evaluated their effectiveness.

12. Defendant Michael W. Bell ("Bell") has been the CFO of State Street since August 2013, and has been its Executive Vice President since 2013. Bell signed the company's annual and quarterly reports throughout his term of employment as CFO, and according to his certifications accompanying with each annual report, reviewed each report filed by State Street, designed internal control procedures or caused such procedures to be designed under his supervision, and evaluated their effectiveness.

13. Defendants Hooley, Resch and Bell are sometimes referred to herein as the "Individual Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

15. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**DEFENDANTS' FRAUDULENT CONDUCT**

18. As set forth in the Deferred Prosecution Agreement between the United States of America and State Street Corporation, filed with the US District Court for the District of Massachusetts on January 18, 2017 in *United States v. State Street Corporation*, 17-cr-10008 (the "Deferred

Prosecution Agreement"), State Street engaged in a large scale fraud against its own clients in the "transition management business". In the Deferred Prosecution Agreement State street admitted to the following:

a. "Among the services State Street provides to clients is transition management. Large institutional investors - such as pension funds and endowments often have complex investments consisting of relatively illiquid assets, or positions that due to their sheer size are difficult to unwind without negatively affecting their price, Transition management, is, generally, the business of helping such institutions efficiently move their investments between and among asset managers or liquidate large investment portfolios, with the goal of minimizing the costs associated with such 'transitions.' As a general matter, transition managers have three principal tasks: (1) to assume responsibility for the performance of investment portfolios during transitions; (2) to communicate with incoming and outgoing asset managers about the composition of their respective portfolios; and (3) to facilitate transitions by executing the necessary trades, with the goal of reducing risk and cost for their clients."

b. "State Street's transition management business falls within its-Portfolio Solutions Group, which is, in turn, part of State Street Global Markets ('SSGM')."

c. "The performance of a transition is typically measured using a metric called the 'implementation shortfall,' which is comprised of a number of different types of explicit and implicit costs. When seeking transition management assignments from prospective clients, transition managers typically prepare an estimate of the implementation shortfall. That estimate is one critical factor, among others, in the awarding of transition management business. After completing the assignment, transition managers

typically provide their-clients with a post-trade analysis that provides the actual results and assesses performance during the transition."

d. "At State Street, the relationship between a transition manager and its client, and their respective responsibilities, are typically documented in a contract referred to as a 'transition management agreement' ('TMA'). The TMA may govern multiple transitions over-the life of a client relationship. Details of specific transition assignments are often set forth in a shorter document referred to as a 'Transition Notice' or 'Periodic Notice,' which contains details of the transition and generally includes the transition manager's agreed-upon compensation. In State Street's case, and during the relevant time period, this compensation was typically either a per- trade charge on securities transactions-associated with the transition, referred to variously as a 'commission,' 'markup,' 'markdown,' or 'spread' (collectively, 'commissions'), or a flat fee for the entire transition expressed as a specific dollar amount or as a percentage on the value of the portfolio to be transitioned. Other than the instances described herein, it was not State Street's practice, during the relevant time period, to charge both a flat fee and a commissioner markup on trades."

e. "At all relevant times, State Street was a signatory to the 'T-Charter,' a voluntary code of best practices for transition managers. Among other provisions, the T-Charter requires the following: 'The Transition Manager, both before and after each transition management assignment fully discloses all the sources of client remuneration received by the Manager and/or its affiliated companies, whether paid explicitly in fees or other charged or earned implicitly through income-sharing, rebates, or trading revenue.' The T-Charter also provides: 'The Transition Manager does not apply dealing commissions

or charges, adjust prices or apply a markup or mark-down other than as agreed with the client in-the contracting documentation and as disclosed in the disclosure document.'"

f. "At all relevant times, Ross MCLELLAN was an executive vice president and the global head of the Portfolio Solutions Group. MCLELLAN-was also the president of State Street Global Markets, LLC, State Street's registered broker-dealer. MCLELLAN worked at State Street's headquarters in Boston, Massachusetts."

g. "At all relevant times, Edward PENNINGS was a senior managing director and head of the Portfolio Solutions Group for Europe, the Middle -East, and Africa ('EMEA'). PENNINGS reported to MCLELLAN. PENNINGS worked at State Street's office in London, England."

h. "At all relevant times, Co-Conspirator # 1 ('CC-1') was an individual whose identity is known to the [Justice Department] and to [State Street]. CC-1 was employed by State Street in its London office as a managing director and head of the Transition Management desk for the EMEA region. CC-1 reported to PENNINGS."

i. "In or about February 2010, State Street, at the direction of MCLELLAN. And PENNINGS, offered to conduct a large fixed-income transition for the sovereign wealth fund of a Middle Eastern country (the 'Middle Eastern Sovereign Wealth Fund') at no charge. In an email to a representative of the Middle Eastern Sovereign Wealth Fund - which was one of State Street's largest transition management clients - PENNINGS wrote; 'We will price the bonds and t-bills at "net"-- this means that for this transition there will be no commission charged on the fixed income trades. We anticipate being, able to charge the other side of the transactions which will enable us to- keep-commissions for [the Middle Eastern Sovereign Wealth Fund] at zero.' In another e-mail, PENNINGS confirmed

to the representative of the Middle Eastern Sovereign Wealth Fund that State Street was in compliance with the T-Charter." (brackets in original).

j. "In a subsequent email to MCLELLAN, PENNINGS noted that if the transitioned assets 'are bonds then we should make our quarter.'"

k. "In a telephone call on or about March 2,2010, PENNINGS and CC-1 discussed the plans to charge hidden commissions on the transition, and PENNINGS instructed CC-1 not to talk about those plans 'with anyone... because it's not going to help our story. Don't even share it with the rest of the team, to be honest.' CC-1 responded, in substance, that PENNINGS would have to interact with someone else on the transition management desk over the course of the transition because he would be away during part of the transition. PENNINGS replied: 'Yeah, OK, but they don't need to know what's in the documentation.'"

l. "In an email to MCLELLAN on or about June 3, 2010, PENNINGS advised that he would 'need you involved on the FI [fixed income] trading desk in [the] US to ensure they do as we want.' That same day, PENNINGS told CC-l that he had spoken with MCLELLAN, who had indicated that he wanted to 'get...involved in the [Middle Eastern Sovereign Wealth Fund] deal... to see how we can make it nice.' PENNINGS relayed that MCLELLAN said to 'take less' on one portion of the portfolio and 'take a lot more' on another portion of the portfolio and that MCLELLAN 'said you can still take 1 or 2 on the outgoing side...I mean, no one is going to fucking notice that…it's a rounding error, so no one is going to notice that.'"

m. "In a telephone call among CC-l, in London, amid two Boston-based traders-on or about June 15, 2010 (the first day of trading), CC-l instructed the traders that

'before you book out the client side, send the executions across and we will have a look and figure out what levels we want to put on-the client side.' On the same day, MCLELLAN, who was in London at the time, asked one of the traders for 'the range [of prices] across the day…' adding, 'Basically, I want the high.'"

n. "MCLELLAN and CC-1 then calculated commissions for the traders to-apply to the trades that would keep the Middle Eastern Sovereign Wealth Fund's client-side prices within the intraday high and low-prices for the securities, thereby helping to hide the commissions from the client."

o. "In or about August 2010, the Middle Eastern Sovereign Wealth Fund issued a request for proposal ('RFP') for another transition that similarly involved a large fixed income component. On or about August 29, 2010, PENNINGS forwarded the information to MCLELLAN, noting, 'Gonna bid zero again,' to which MCLELLAN responded 'Agree 100 percent.'"

p. "On or about October 18, 2010, PENNINGS responded to the Middle Eastern Sovereign Wealth Fund's RFP, stating, 'We are able to quote zero commissions for this transition, and in addition, when awarded the whole trade, we will absorb all transaction fees normally charged by the custodian.'"

q. "On or about October 21, 2010, PENNINGS reported to MCLELLAN and others that State Street had won the transition."

r. "The draft periodic notice State Street sent to the Middle Eastern Sovereign Wealth Fund stated, 'Trades will not attract any commission and will be priced net. The manager may benefit from a bid-ask spread.' When the Middle Eastern Sovereign Wealth Fund returned the executed periodic notice, that language had been deleted."

s. “Notwithstanding State Street’s representations to the Middle Eastern Sovereign Wealth Fund that it would do the transition for zero commissions, the trading instructions issued on November 3, 2010 (the first day of trading), stated that commissions should be ‘2 bps of value on the sellside and 18 bps of value on the buyside.’ The instructions also told traders to send the high and low of the day to PENNINGS, CC-1, and another individual on the transition management desk prior to booking trades.”

t. “State Street proceeded to charge the Middle Eastern Sovereign Wealth Fund significant commissions on the fixed income trading it conducted without disclosing those commissions to the Middle Eastern Sovereign Wealth Fund or obtaining the Fund’s consent to pay them.”

u. “The November 2010 transition also contained a significant foreign exchange (‘FX’) component. The periodic notice provided that foreign exchange transactions required the prior approval of the Middle Eastern Sovereign Wealth Fund.

v. “On or about the first day of trading, November 3, 2010, State Street neither sought approval for nor conducted any FX trading. Following the market close that day, the Federal Reserve Board made a quantitative easing announcement that had a substantial effect on the FX markets.”

w. “On or about November 4, 2010, after realizing that the FX market had-moved against the. Middle Eastern Sovereign Wealth Fund’s position [causing it substantial losses], State Street conducted the FX trades between approximately 9:30 and 11 am, without obtaining the prior approval of the Middle Eastern Sovereign Wealth Fund.”

x. “At approximately 11:45 am [on November 4], State Street sought the approval of the Middle Eastern Sovereign Wealth Fund for the FX trading; without revealing that the trading had, in fact, already been completed [on November 3]. The Middle Eastern Sovereign Wealth Fund granted its approval for the FX trading at approximately 2:30 pm.”

y. “That same day, PENNINGS wrote to MCLELLAN about the FX situation stating, ‘Hopefully we are ok although we do need to find the appropriate benchmark as we want to be in line with the pre-trade given that this is what they look at.’ MCLELLAN responded: ‘Use rates at approval time.’””

z. “Also on November 4, CC-1 sent an e-mail to PENNINGS setting forth the benchmarks being used to track performance. CC-1 stated that State Street would use ‘14:30 London time today prices for FX (the time [the representative of the Middle Eastern Sovereign Wealth Fund] gave us the OK to do the FX.’ PENNINGS responded, ‘Good stuff. Let’s not highlight the benchmark times though.’”

aa. “On or about November 18, 2010, State Street sent the Middle Eastern Sovereign Wealth Fund a post-trade report for the transition. The implementation shortfall analysis in that report identified the FX implementation shortfall as being approximately $519,000 as compared to a November 3 benchmark.

bb. “In fact, as noted in the November 4, 2010 e-mails cited above, State Street did not use FX prices on November 3 as a benchmark, but rather used prices from mid-afternoon on November 4, hours after the FX trading had been concluded. Had State Street used the November 3 benchmark it represented to the Middle Eastern Sovereign Wealth Fund it was using to measure performance, it would have been-forced to report an FX

implementation shortfall of approximately $29.6 million - meaning that the Bank overstated its performance on the FX trades alone by more than $29 million."

cc. "In or about June 2010, State Street conducted a fixed income transition for a pension fund, based in the Netherlands that managed the retirement assets of a group of professionals (the 'Dutch Pension Fund')."

dd. "On or about June 17, 2010, a representative of the Dutch Pension Fund asked PENNINGS, 'Do the estimated trading costs include the fees that you will charge and how much will these fees (in bp or in cash amount) approximately be?' PENNINGS replied, 'In the analysis we have built in 1 bp that the execution desk takes out of the spread, so yes the total implementation shortfall estimate includes all fees.'"

ee. "On or about June 18, 2010, after the Dutch Pension Fund indicated that State Street had. won the transition but that it would use another bank for futures clearing associated with the transition (for which State Street would have earned additional, agreed-upon revenue), PENNINGS wrote to MCLELLAN and stated, 'Just have to charge them a bit more given that we don't get futures revenue.'"

ff. "During the trading, which occurred in late June 2010, State Street charged the Dutch Pension' Fund approximately 1.5 basis points in commissions (rather than 1.0 basis points promised), without disclosing the increased commission charges to the Dutch-Pension Fund or obtaining the Fund's agreement to pay those additional charges."

gg. "In or about December, 2010, MCLELLAN and PENNINGS discussed State Street's bid to manage a transition for a large public-pension fund based in-Dublin, Ireland (the 'Irish Government Pension Fund'). In an email to MCLELLAN on or about December 1, 2010, PENNINGS wrote: 'Gotta win this one! Any ideas how to get more

revenue would be appreciated... How about a 1 [basis point] management fee or something of that nature, no commissions and then take a spread? My tax-dollars are after all paying for their reckless spending.' MCLELLAN replied: 'agree with a zero commission bid,' but added that the Bank's traders would 'need to trade net,' such-that commissions would not be disclosed in trading results provided to-the client. PENNINGS responded: 'Great minds think alike. We have to charge fee then otherwise they get suspicious.'"

hh. "State-Street ultimately proposed flat management fee of 1.25 basis points (0.0125%) of the value of the transitioned assets. The proposal specified that there would be no fixed income or equities commissions."

ii. "In an email to CC-L, PENNINGS noted: 'Just to clarify - 1.25 bps is management fee. The extra quarter point makes it look like we actually thought about it and did the calculations…'"

jj. "After the Irish Government Pension Fund awarded State Street only part of the transition, the Bank negotiated for, and the Irish Government Pension Fund agreed to, a slightly higher flat fee of 1.65 basis points (0.0165%) of the value of the assets, plus certain specified costs for futures and foreign exchange transactions."

kk. "In a subsequent telephone call, PENNINGS told CC-1 that 'we just need to be very; very creative, which we will,' and added: 'Make sure it... doesn't say anything about not taking any spreads, because we're going to have to in the U.S.' PENNINGS instructed CC-1 not to inform the transition manager assigned to the deal about the hidden commissions."

ll. “In an email to MCLELLAN, PENNINGS reported that the deal with the Irish Government Pension Fund was for ‘1.65 bps. Need to be very creative.’ MCLELLAN responded: ‘We will.’”

mm. “On or about March 23, 2011, CC-1 reviewed a draft of the post-trade report for the first tranche of the Irish Government Pension Fund transition, and instructed the transition manager to alter the definition of ‘Commissions’ in-the report because, according to CC-1, ‘We are charging a flat fee.’ On or about March 29, 2011, State Street-sent the Irish Government Pension Fund the post-trade report with the term ‘Commissions’ removed from the definitions page.”

nn. “On or about April 5, 2011, prior to the second tranche of the Irish Government Pension Fund transition, PENNINGS emailed MCLELLAN that the fund ‘just informed us they did not want to use futures on the trade scheduled for later this week,’ for which the fund had agreed to pay State Street an additional fee. PENNINGS added: ‘I think this will increase the “spread.”’”

oo. “Because the Irish Government Pension Fund transition involved a significant amount of equities for which commissions were ordinarily broken out and reported automatically by State Street’s trading systems MCLELLAN, PENNINGS, and others devised a plan to conduct the trades in a special trading account ordinarily used to guarantee customers a specific price - the volume weighted average price (‘VWAP’) of trades executed over the course of a day. Using the VWAP account, State Street was able to include a commission of 2 cents per share on each of the U.S. equities trades it executed for the Irish Government Pension Fund, without the commission being broken out on reports sent to the client.

pp. "Ultimately, State Street charged undisclosed commissions and mark-ups totaling approximately $4.5 million in addition to title agreed-upon management fee of approximately $1.6 million."

qq. "In or about March 2011, State Street received an RFP from a pension fund based, in Ireland that managed the retirement assets of employees at an Irish company (the 'Irish Commercial Pension Fund') for a fixed income and equities transition."

rr. "In its response to the RFP, State-Street proposed a flat management fee of €400,000 and noted that it was a founding member of the T-Charter and that it would be 'fully compliant to the principles set out in the T-Charter.'"

ss. "In or about April 2011, the Irish Commercial Pension Fund negotiated State Street's-management fee down to €350,000."

tt. "Ultimately, State Street took undisclosed mark-ups totaling approximately $1.1 million in addition to the agreed-upon €350,000 management fee."

uu. "In or about December 2010, State Street received an RFP from a pension fund based in England that managed the retirement assets of employees of an English company (the 'British Commercial Pension Fund')."

vv. "While State Street's RFP response contemplated a commission of 5 basis points, State Street and the British Commercial Pension Fund subsequently agreed that State Street would receive a flat management fee of £350,000."

ww. "Ultimately, State Street took undisclosed mark-ups totaling approximately $1 million in addition-to the agreed-upon £350,000 management fee."

xx. In or about February 2011, State-Street received an RFP from a pension fund based in London, England that managed the retirement assets of certain employees of

the British government (the 'British Government Pension Fund'). The RFP concerned a fixed-income transition involving more than £3.2 billion in assets. PENNINGS forwarded the RFP to MCLELLAN with the note: 'Confidential but check this baby out...gotta win that one!' MCLELLAN replied: 'Thin to win.'"

yy. "In its response to the RFP, State Street proposed a flat fee of 1.75 basis points (0.0175%) of the value of the assets and promised to 'provide full disclosure' of 'all costs incurred in the transition and any additional revenue sources…resulting from the transition.' In a table breaking down costs associated with the transition, the Bank indicated that no commissions would be applied. State Street further pledged 'to put our client's interest ahead of our own.'"

zz. "On February 21, 2011, after the British Government Pension Fund cut the size of the transition to approximately £1.3 billion, PENNINGS confirmed in an email to an executive of the fund that 'even though the value is significantly less, we can do this project for a management fee of 1.75 [basis points] of the portfolio value of £1.3 bln or £227,500.' PENNINGS forwarded this email to MCLELLAN with the note: 'Who's the daddy...Happy president's day!' MCLELLAN responded: ''Nice work.' PENNINGS then-replied: 'I'm thinking 1.5-2 [basis points]...'"

aaa. "In a subsequent email to the British Government Pension Fund, PENNINGS again confirmed that '[t]he fee includes-.all trading required,' adding: 'Pls don't make me go this low every time though!'"

bbb. "On or about March 21, 2011 the instructions sent to traders handling the transition for the British Government Pension Funds provided in bold-faced lettering; 'ZERO COMMS.' That same day, in a telephone call with CC-1, PENNINGS -said he had

just had a call with MCLELLAN in which MCLELLAN 'said "how much do you want to take?" and I said "whatever, let's see how we go."""

ccc. "Thereafter, at the direction of MCLELLAN, PENNINGS, and CC-1, State Street secretly applied commissions of one basis point (0.01%) to all U.S. trades, and 2 basis points (0.02%) to all European trades it conducted on behalf of the British Government Pension Fund, in addition to the agreed-upon flat fee. For example, on or about March 22, 2011, MCLELLAN instructed a U.S. fixed income trader to 'take a basis-point of yield' on trades for the British Government Pension Fund, notwithstanding that the written-trading instructions issued by the transition manager said to charge zero commissions. Later that same day, MCLELLAN instructed the trader to delete any reference to commissions on the file of trading results he sent to the transition manager."

ddd. "On or about March 23, 2011, MCLELLAN .instructed the U.S. fixed income trader to 'stay with a basis-point of yield' and confirmed that the trader should once again 'zero out' the commissions when sending over the trading file to the transition manager."

eee. "After the British Government Pension Fund independently learned that commissions had been charged on certain U.S. trades, MCLELLAN, PENNINGS, and CC-1 took steps to prevent the British Government Pension Fund, and State Streets internal compliance staff, from learning the truth, by falsely telling them that the commissions had been charged by mistake and were limited to the U.S. For example, in response to a June 21, 2011 email from an executive of the British Government Pension Fund requesting confirmation that '£242,305 (equal to 1.75 [basis points] on the [assets under management]... is the sole revenue for SSGM and/or any of its affiliates on this event,'

PENNINGS responded: 'Yes £242,305 (It should equal 1.75 [basis points] of the total assets).'"

fff. "When the fund executive informed PENNINGS that auditors reviewing publicly available data had discovered what appeared to be a one basis point commission on all U.S. trades, PENNINGS responded: 'That doesn't seem right so let me investigate with the US desk and get back to you.'"

ggg. "On or about June 22, 2011, MCLELLAN directed PENNINGS to advise the British Government Pension Fund that State Street had applied 'inadvertent commissions' to U.S. trades, but not to disclose that commissions had also been applied to European trades, for which market trading, results were not publicly available. At MCLELLAN's direction, State Street refunded the British Government Pension Fund the approximately $1 million in commissions it had secretly charged on U.S. trades - but not the approximately $2 million State Street had, unbeknownst to the fund, charged on European trades."

hhh. "MCLELLAN and PENNINGS later advised State Street's compliance staff that State Street had erroneously charged the British Government Pension Fund a commission on U.S. trades - but not that State Street had charged the commission intentionally, or that it had also charged a commission on European trades."

iii. "State Street's compliance staff accepted these explanations at face value and undertook no independent investigation until the misconduct became more widely known within the Bank shortly thereafter."

19. In addition, on April 20, 2016, the Securities Division of the Office of the Secretary of State of the Commonwealth of Massachusetts filed an Administrative Complaint ("the Massachusetts Administrative Complaint") that set forth the following allegations:

a. "Over the past 18-years, State Street overcharged clients using concealed markups as high as 1,900% on certain out-of-pocket expenses."

b. "State Street provides custody and administrative services to pension plan, mutual fund, hedge fund, and other institutional investors, including clients located in Massachusetts."

c. "Throughout the Relevant Time Period, eighty-one Massachusetts public pension funds contracted with State Street for custodial services."

d. "Throughout the Relevant Time Period, State Street, per custodial contracts, typically charged custodial clients for out-of-pocket expenses." In other words, they were contractually entitled to, and did, pass along costs that State Street incurred in servicing client accounts on to the clinets.

e. "Out-of-pocket expenses included, among other categories of expenses, 17f-5 review, audit-CCO attestations, audit-SAS 99, audit-SSAE 16/SOC 1, archives/storage, checks and stop payments, telephone, duplication and printing, courier/delivery, postage, Society for Worldwide Interbank Financial Telecommunication messages (hereinafter 'SWIFT Messages'), wires, forms and supplies, pricing and verification, and support/micro equipment (hereinafter 'Out-of-Pockets')."

f. "At least two State Street custodial clients interpreted Out-of-Pockets to represent pass through charges—i.e. actual cost without an added profit markup."

g. “According to the SWIFT website, accessible at www.swift.com (hereinafter ‘SWIFT Website’), SWIFT is a global member-owned cooperative and the world’s leading provider of secure financial messaging services.”

h. “According to the SWIFT Website, SWIFT Messages are secure electronic messages relating to payments, securities, treasury, and trade.”

i. “On July 29, 2002, a consulting firm presented findings to State Street including a report titled ‘Capturing Value From Billed-Versus-Contracted Discrepancies’ (hereinafter ‘Fee Report’).”

j. “The Fee Report identified an opportunity for State Street to recover a total of $9-13 million revenue related to Out-of-Pocket and fee-based expenses by ‘more aggressive data capture and billing practices.’”

k. “State Street SWIFT Message expenses included two components: (1) unit charges and (2) State Street’s SWIFT Message fee (hereinafter ‘SWIFT Message Fee’).”

l. “The unit charge represented the per SWIFT Message expense charged by SWIFT to State Street.”

m. “The standard SWIFT Message Fee of $5.00 included State Street’s overhead expense associated with sending SWIFT Messages.”

n. “While the unit charge associated with SWIFT Messaging decreased over time, the standard SWIFT Message Fee remained $5.00.”

o. “As early as November 1, 2004, State Street employees internally discussed the SWIFT Message Fee via email, with one State Street employee (hereinafter ‘State Street Employee One’) stating, ‘[f]or those clients that are billing back to their client, most

clients are billing $5 per message. **The true cost is about $2 per message.'** (Emphasis added)."

p. "On December 12, 2005, in an email response with the subject line '[REDACTED] SWIFT Recovery' concerning a specific institutional client, a State Street employee (hereinafter 'State Street Employee Two') wrote:

> Really I think the only true decision to be made is whether or not we are going to charge the **standard ("grossed up") charge or a modified one**. The client I had referenced in our phone conversation was actually [REDACTED] (I think I said [REDACTED]) and they were already at a non-standard charge of $3.50 as opposed to the standard charge of $5. There is some analysis currently going on around this and **I have been told unofficially that the true "cost" is around $1.**

(Emphasis added)."

q. "In 2007, State Street Employee Two commented:

Sometime back at the beginning of time there was some form of analysis that arrived at the $5 per message (my guess / understanding is that there was overhead included in this figure at the time that now should be spread over a much larger universe). Today **that figure is grossly inaccurate in terms of actual cost or even any legitimately defendable 'fully loaded cost'. I would absolutely not charge this rate to any new clients.**

(Emphasis added)."

r. "While the true cost for SWIFT Messages decreased from 2005 to 2009, the standard SWIFT Message Fee passed through to State Street custodial clients remained consistent."

s. "On April 1, 2009, when discussing the true cost of SWIFT Messaging assessed to State Street, State Street Employee One stated, 'I think it is 25 cents to be honest with you.'"

t. “In November 2010, while a certain State Street employee (hereinafter ‘State Street Employee Three’) stated the $5.00 SWIFT Message fee covered State Street’s overhead, one State Street employee (hereinafter ‘State Street Employee Four’), with knowledge of the actual cost of a SWIFT Message, incredulously responded in an email, ‘$4.96 to cover [overhead]? Is she serious??!!’”

u. “When asked via email for the actual costs associated with the $5.00 overhead, State Street Employee Three responded, ‘There isn’t one.’”

v. “Despite custodial clients paying a markup as high as 1,900%, State Street internally paid actual cost associated with SWIFT Messages.”

w. “On April 1, 2009, State Street Employee Four, when discussing the waiver of the SWIFT Message Fee for a specific client, believed that only actual cost was passed on to State Street when billed internally:

> Upon further research these charges are not being applied to the invoices. [REDACTED] told me to use the link to get what is being passed through but in the case of [REDACTED] the fee schedule waives SWIFT fees and they are charged against our cost center rather than billed to the client**. I can't find the cost on the P & L but the real cost must be passed along to us (not the mark up cost).**

(Emphasis added).”

x. “State Street also received rebates from SWIFT, which operated as a not-for-profit entity and rebated excess revenues to participating organizations, further offsetting State Street’s SWIFT Message overhead.”

y. “According to a 2012 email, State Street received a rebate of approximately $1.5 million from SWIFT.”

z. “Furthermore, according to information contained on an internal excel spreadsheet distributed in 2014 by a State Street employee:”

SWIFT as a non-profit organization caps the amount it bills State Street for use of the platform. A rebate is issued annually by SWIFT to State Street if this cap is exceeded; this is allocated by State Street as a contra expense to the P&L. In 2013, [State Street United States Investment Services] Boston clients had accrued a Unit Cost of $1,613,249 for SWIFT activity, but were rebated $519,186.

aa. “As early as December 14, 2005, State Street employees questioned State Street’s SWIFT Message Fee as ‘out-of-pocket.’”

bb. “On December 14, 2005, a State Street employee (hereinafter ‘State Street Employee Five’) questioned via email, ‘[h]ow do we get our arms around what is a realistic number. **If it's costing us $1 and we are charging $5 my concern is that is no longer an out-of-pocket.’** (Emphasis added).”

cc. “In March 2009, State Street employees once again questioned the reasonableness of State Street’s SWIFT Message Fee via email, with State Street Employee Four stating, ‘[...] I believe we are charging some absurd fee per message (about $5).’”

dd. State Street Employee Four reiterated this sentiment in another email two days later, stating, ‘The $5 SWIFT message fee is billed as an out of pocket which by definition should be a pass through charge at cost.’”

ee. “As State Street employees began to obtain more information in April 2009 regarding the true cost associated with SWIFT Messages, State Street Employee One stated in an email, ‘Why we are marking up SWIFT charges is beyond me. I understand OOP's [out-of-pockets] as pass through charges.’”

ff. “Only hours later, State Street Employee One again emailed, stating, ‘I'm telling you. I learn something every day. Simply not amazed at anything that goes on here anymore.’”

gg. “On April 2, 2009, State Street Employee Four stated that the SWIFT Message Fee was a big problem. According to the email: "Out of pocket" with "mark up" = Big Problem.’”

hh. “The same State Street employee further emailed:

> The fact [REDACTED] can't provide us what we pay SWIFT per message means **there is some serious monkey business going on here**. It will be interesting to see what he comes back with. I was told by [REDACTED] **what we bill = Per Message fee paid to SWIFT+ overhead+ programming fees. That is a bunch [of] crap.**

(Emphasis added).

ii. “On April 12, 2009, State Street Employee Five requested information regarding the SWIFT Message Fee, to present to a State Street executive (hereinafter “State Street Executive’), stating, “I want to lay this out to [State Street Executive], this is some big $.’”

jj. “On April 13, 2009, State Street Employee Four responded, summarizing:”

1. The fee we pay SWIFT is .12 per SMAC unit message and .05 per MCH unit message. There is an initiative underway to move these fees to .09 and .04 for SMAC and MCH respectively.
2. The $5 fee represents coverage of the indirect charges for SWIFT messages. This includes the cost of SWIFT terminals, maintenance of files to SWIFT and all other overhead costs incurred in State Street to ensure proper transmission of the SWIFT messages. According to research undertaken by [REDACTED] over the past week he estimates the true cost of these indirect charges as about .25. A $4.50 markup per message results.
3. [REDACTED] stated he knows exactly the revenue generated from these SWIFT message fees across [REDACTED]'s area. However, he would not disclose this figure to me other to say it is significant. He said that if you or [REDACTED] want this detail he would be willing to share. Just from what we have seen in our group the **annual revenue from this markup must be in the tens $ of millions.**

(Emphasis added).

kk. “In an internal document regarding revenue, sent to State Street Executive on April 13, 2009, State Street Employee Five commented in part, “I would think that our

clients would think that OOP expenses are pass thru's with maybe a bit of mark-up to cover our expenses. [...] We charge our clients $5.00 per message - an **exorbitant mark up that will certainly piss off clients when they figure this out**.' (Emphasis added)."

ll. "In an email response, concerning the internal document, State Street Executive stated, "I would delete the section on OOP expenses. I would do more work on your own and maybe raise as a strategy question with a small group verbally only.'"

mm. "According to an email on July 20, 2010, State Street Employee Four acknowledged that the SWIFT Message Fee was not, "[...] a true OOP as we have portrayed [...].'"

nn. "According to an email sent on October 24, 2006 by State Street Employee Five, "[...] [t]his could be another 'repo' type issue where **if the client ever asked for the detail of the charges we could have egg on our face**.' (Emphasis added)."

oo. "A response from a State Street employee later on October 24, 2006, summarily stated, '[REDACTED] figured it out a few years ago ... it is an issue.'"

pp. "Internal communications in 2007 reflected that State Street employees were aware of overcharging issues with SWIFT Messages, as State Street Employee Five emailed, 'We can't be in a position on [REDACTED] that they discover that **we are taking them to the cleaners on SWIFT charges**.' (Emphasis added)."

qq. "Later, in 2009, State Street Employee Five emailed, stating, '[t]his is getting messy. We are charging the fund a huge mark-up to send SWIFT messages to a service provider who will know exactly what the messages cost.'"

rr. "Also in 2009, when asked by a State Street employee what to tell a client regarding SWIFT Messages, State Street Employee Four responded, 'keep information sharing at a minimum on this.'"

ss. "In a separate email exchange on April 6, 2009, other State Street employees also questioned State Street's SWIFT Message Fee."

tt. "When asked whether a senior State Street employee thought that State Street was charging too much in relation to SWIFT Messages, the senior State Street employee responded:

> No issues from me. As far as I am concerned it's been $5.00 for many years on many clients and I have no intention to change it. I believe that Managers need an education on out of pockets as many of them do not understand how the bank arrives at some of the numbers here. **They should be straight pass thru but as well all know this place does tack on additional expenses and marks them up to cover all internal costs**.

(Emphasis added).

uu. "Approximately one year later, in February 2010, when asked via email about seeking the SWIFT Message Fees generated from the liquidation of a client fund, State Street Employee Four expressed concern, stating, '[t]here is a huge markup with SWIFT charges and **I don't want her asking for detail and then the secret will be out there**.' (Emphasis added)."

vv. "Later in 2010, certain clients with more specialized knowledge of SWIFT Messages began to balk at State Street's SWIFT Message Fee."

ww. "According to one email, on July 15, 2010, a State Street employee summarized, '[REDACTED] does not want to pay the $5 per message. He thinks that is a **huge injustice because he knows how little the message costs**.' (Emphasis added)."

xx. "As part of the Enforcement Section Inquiry, Enforcement staff contacted an investment manager (hereinafter 'Client One') regarding State Street custodial services.

yy. “Client One’s Master Custodial Contract, executed on April 2, 2007, allowed State Street to charge for Out-of-Pocket expenses.”

zz. “According to an email sent by Client One to State Street on December 3, 2010 (hereinafter ‘December 3rd Email’), following a presentation made earlier by State Street, Client One’s Chief Financial Officer questioned certain Out-of-Pocket expenses, including SWIFT Messages.”

aaa. “Upon information and belief, following the December 3rd Email, State Street told Client One that SWIFT Message costs were pass through charges.”

bbb. “Client One believed that pass through charges meant that State Street was charging the actual cost that State Street was incurring for SWIFT Messages.”

ccc. “After structural changes to certain Client One funds, which Client One believed would lower custodial costs, Client One again questioned Out-of-Pocket expenses on February 6, 2014.”

ddd. “Upon information and belief, following questions posed by Client One on February 6, 2014, State Street again told Client One the Out-of-Pocket expenses were pass through charges.”

eee. “Certain Client One funds passed Out-of-Pocket expenses billed by State Street to retail investors.”

fff. “Beginning in 2014, Client One commenced a Request for Proposal (hereinafter ‘2015 RFP’) for custodial firms to submit bids for custodial services.”

ggg. “Through the 2015 RPF process, Client One learned that at least one custodial agent charged only $0.25 for SWIFT Messages and sometimes completely waived SWIFT Messaging charges.”

hhh. “State Street at one point offered Client One a reimbursement of ‘mere 15 months of overcharges.’”

iii. “According to an email by Client One’s Chief Financial Officer sent on June 3, 2015, ‘I am sure you can understand our frustration, especially given that we have been inquiring about the accuracy of these charges since 2010 (5 1/2 years), and our disappointment that we are now being offered a correction that covers a mere 15 months of overcharges.’”

jjj. “According to a letter of understanding, State Street eventually agreed to reimburse certain Out-of-Pocket fees and charges to Client One from January 2009 to May 2015.”

kkk. “The Enforcement Section also contacted an international financial organization (hereinafter ‘Client Two’), which used State Street for certain custodial services.”

lll. “According to Client Two, Client Two maintained multiple accounts with State Street, including one account focused on global equities and fixed income investments starting in 2014 (hereinafter the ‘Equities Fund’).”

mmm. “A Client Two employee (hereinafter ‘Client Two Employee’) observed an increase in out-of-pocket expenses concerning the Equities Fund.”

nnn. “Client Two Employee questioned State Street regarding out-of-pocket expenses.”

ooo. “Upon information and belief, State Street informed Client Two Employee that the charges represented out-of-pocket expenses.”

ppp. "Client Two Employee expected that out-of-pocket expenses were actual expenses incurred by State Street, with no profit included."

qqq. "Client Two Employee requested a breakdown of out-of-pocket expenses and learned that out-of-pocket expenses included a SWIFT Message Fee of $5.00."

rrr. "According to Client Two Employee, State Street never provided a 'breakdown' of State Street's Swift Message Fee."

sss. "According to Client Two Employee, in the third quarter of 2015, Client Two and State Street amended their fee agreement to memorialize State Street's $5.00 Swift Message Fee."

ttt. "At the time of the amended fee agreement, Client Two Employee believed that the SWIFT Message Fee represented State Street's actual cost for SWIFT Messages."

**Materially False and Misleading Statements**

20. On February 27, 2012, the Company filed a Form 10-K for the fiscal year ended December 31, 2011 (the "2011 10-K") with the SEC, which provided the Company's year-end financial results and position. Specifically, they included the following financial data for State Street (all amounts in millions USD):

| | FY ended 12/31/2011 | FY ended 12/31/2010 | FY ended 12/31/2009 |
|---|---|---|---|
| Total Revenue | $9,594 | $8,953 | $8,640 |
| Total Net Income | $1,920 | $1556 | $1,803 |

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Total liabilities | $197,429 | $142,718 |

21. The statements referenced in the preceding paragraph concerning revenue, income and liabilities were materially false and/or misleading because they failed to disclose that from June 2010 until September 2011, Boston-based State Street deliberately overcharged six clients a total of $20.2 million in the transition management department, and overcharged for SWIFT fees throughout the class period and for over one decade prior. State Street improperly recorded these client overcharges as revenue in each fiscal year in which the overcharge occurred. These fraudulent charges overstated State Street's revenues and profits, and understated State Street's liabilities. In particular, State Street understated its liabilities by $240 million at each fiscal year end due to the overcharging of SWIFT fees and its consequent obligation to return those fees to its customers.

22. On February 22, 2013, the Company filed a Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end financial results and position. Specifically, they included the following financial data for State Street (all amounts in millions USD):

| | FY ended 12/31/2012 | FY ended 12/31/2011 | FY ended 12/31/2010 |
|---|---|---|---|
| Total Revenue | 9,649 | 9,594 | 8,953 |
| Total Net Income | 2,061 | 1,920 | 1,556 |

| | December 31, 2012 | December 31, 2011 |
|---|---|---|
| Total liabilities | $201,713 | $197,429 |

23. The statements referenced in the preceding paragraph concerning revenue, income and liabilities were materially false and/or misleading because they failed to disclose that from June

2010 until September 2011, Boston-based State Street deliberately overcharged six clients a total of $20.2 million in the transition management department, and overcharged for SWIFT fees throughout the class period and for over one decade prior. State Street improperly recorded these client overcharges as revenue in each fiscal year in which the overcharge occurred. These fraudulent charges overstated State Street's revenues and profits, and understated State Street's liabilities. In particular, State Street understated its liabilities by $240 million due to the overcharging of SWIFT fees and its consequent obligation to return those fees to its customers.

24. On February 21, 2014, the Company filed a Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position. Specifically, they included the following financial data for State Street (all amounts in millions USD):

| | FY ended 12/31/2013 | FY ended 12/31/2012 | FY ended 12/31/2011 |
|---|---|---|---|
| Total Revenue | 9,884 | 9,649 | 9,594 |
| Total Net Income | 2,136 | 2,061 | 1,920 |

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Total liabilities | $222,913 | $201,713 |

25. The statements referenced in the preceding paragraph concerning revenue, income and liabilities were materially false and/or misleading because they failed to disclose that from June 2010 until September 2011, Boston-based State Street deliberately overcharged six clients a total of $20.2 million in the transition management department, and overcharged for SWIFT fees throughout the class period and for over one decade prior. These fraudulent charges overstated

State Street's revenues and profits, and understated State Street's liabilities. In particular, State Street understated its liabilities by $240 million due to the overcharging of SWIFT fees.

26. February 20, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results and position. Specifically, they included the following financial data for State Street (all amounts in millions USD):

| | FY ended 12/31/2014 | FY ended 12/31/2013 | FY ended 12/31/2012 |
|---|---|---|---|
| Total Revenue | 10,295 | 9,884 | 9,649 |
| Total Net Income | 2,037 | 2,136 | 2,061 |

| | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Total liabilities | $252,646 | $222,913 |

27. The statements referenced in the preceding paragraph concerning revenue, income and liabilities were materially false and/or misleading because they failed to disclose that State Street overcharged for SWIFT fees throughout the class period and for over one decade prior. These fraudulent charges overstated State Street's revenues and profits, and understated State Street's liabilities In particular, State Street understated its liabilities by approximately $240 million due to the overcharging of SWIFT fees.

**The Truth Emerges**

28. On January 31, 2014, *Bloomberg* published an article entitled "State Street Fined $37.7 Million in U.K. for Hidden Fees," stating that "State Street Corp.'s U.K. unit was fined 22.9

million pounds ($37.7 million) by the Financial Conduct Authority for charging clients 'substantial' mark-ups without their consent," stating in pertinent part:

**State Street Fined $37.7 Million in U.K. for Hidden Fees**

*Suzi Ring and Christopher Condon*

January 31, 2014, 1:02 PM EST

State Street Corp.'s U.K. unit was fined 22.9 million pounds ($37.7 million) by the Financial Conduct Authority **for charging clients "substantial" mark-ups without their consent.**

State Street, the third-biggest custody bank, **"developed and executed a deliberate strategy" to charge undisclosed fees on top of agreed management or commission payments at a unit that helps institutions restructure their investments**, the FCA said in an e-mailed statement.

**"State Street U.K. allowed a culture to develop in the U.K. Transitions Management business which prioritized revenue generation over the interests of its customers,"** said Tracey McDermott, FCA director of enforcement and financial crime. "Their conduct has fallen far short of our expectations."

**From June 2010 until September 2011, Boston-based State Street deliberately overcharged six clients a total of $20.2 million**, the FCA said. Total revenue for the unit that overcharged clients during the same period was $77.9 million, meaning the extra money represented 26 percent of revenue. The firm received a 30 percent discount for settling early with the FCA, avoiding a larger fine of 32.7 million pounds.

State Street fell 1.4 percent to $67.27 at 12:24 p.m. in New York.

**'Unacceptable Situation'**

"Over the past several years, we have worked hard to enhance our controls to address this unacceptable situation," State Street said in a statement on its website. "The FCA in its notice is critical of our business controls within the U.K. transition management business and our control functions in the U.K. at that time. We acknowledge these as historical problems and have undertaken extensive efforts to address both."

The FCA said it didn't find any evidence that executives outside State Street's Portfolio Solutions Group for Europe, Middle East and Africa had knowledge of the charges or of attempts to conceal them.

State Street said it "dismissed individuals centrally involved in the overcharging" in 2011. Alicia Curran Sweeney, a spokeswoman, declined to comment further on the former employees involved.

The hidden fees came on a service State Street provides to large customers such as asset managers and pension funds, helping them switch money between outside asset managers or when they restructure investments.

**In several instances, State Street executives quoted fixed fees to its clients, who were not identified in the FCA's statement, and then built in extra profit through undisclosed mark-ups on securities trades**, according to the FCA.

**Employee E-mails**

One customer made changes to $6 billion invested in bonds. After an initial transaction, **State Street's report to the client made no reference to mark-ups that amounted to $2,738,344**, the FCA said.

When the same client ordered another transaction, one State Street executive within the unit sent another an e-mail reading, "Back up the truck!," according to documents made available by the FCA.

Before the second transaction, managers also exchanged e-mail messages discussing whether State Street's lawyers had examined documents related to the deal.

"Did they [legal] look at the original agreement?" wrote one manager.

"Absolutely not. Nor did they look at the periodic notice. This can of worms stays closed!," the colleague wrote back, **adding that there is "no way" they could disclose the spread, or the profit taken for executing trades.**

**Cover Up**

The extra charges eventually came to light after a client hired a consultant who examined publicly available bond pricing and found undisclosed mark-ups.

Managers in the unit tried to cover up the charges by claiming they were "inadvertent" and rebated the company $1 million. They also told State Street's compliance officials the charges were erroneous.

**An internal investigation later revealed the charges were added deliberately and the firm notified regulators**. The company has audited the unit and added new policies for recording, approving and monitoring client charges within it.

"We have bolstered our control functions, governance and culture across all of our UK businesses," the company said in the statement.

Custody banks keep records, track performance and lend securities for institutional investors including mutual funds, pension funds and hedge funds. State Street also manages investments for individuals and institutions.

[Emphasis added].

29. On this news, shares of State Street fell $3.64 per share, or over 5.3%, over two trading days to close at $64.60 per share on February 3, 2014, damaging investors.

30. On December 17, 2015, before market hours, State Street filed a Form 8-K with the SEC announcing "that it has incorrectly invoiced certain expenses to asset servicing clients", and that "[b]ased upon the Company's preliminary assessment, over the 18-year period for which it has accessible records, approximately $200 million or more of expenses may have been incorrectly invoiced." The Company admitted regret and stated that it will "make any required improvements to its billing practices," stating in pertinent part:

> State Street Corporation announced today that it is informing clients about a review that it initiated into the manner in which it invoiced certain expenses to asset servicing clients. The review, which is not complete, addresses the amounts invoiced for specific categories of expenses. **Based on the results of the review to date, State Street believes that it has incorrectly invoiced certain expenses to asset servicing clients, primarily in the United States**. **State Street deeply regrets this matter**. At the conclusion of its review, State Street will compensate affected clients fully, including interest, and **make any required improvements to its billing practices**.
>
> **Based upon the Company's preliminary assessment, over the 18-year period for which it has accessible records, approximately $200 million or more of expenses may have been incorrectly invoiced**. During this 18-year period, State Street estimates that it has invoiced asset servicing clients a total of approximately $400 million for expenses falling within the categories being

reviewed. Annual amounts invoiced for these expenses ranged from approximately $9 million in the early years to approximately $36 million in 2014. The actual amount to be reimbursed to clients will not be known until the review is completed, and that amount could differ materially from the Company's preliminary assessment. In fiscal year 2014, the categories of expenses under review represented approximately 0.7 percent of State Street's total asset servicing fee revenue of $5.1 billion.

The Company will provide additional information on this matter in its scheduled fourth quarter 2015 earnings release and call on January 27, 2016.

State Street is likely to reflect in its consolidated financial statements reported as of December 31, 2015 obligations in connection with the above-described review. In addition, it has notified certain governmental authorities about its review. State Street may become subject to regulatory inquiries and litigation in connection with this matter, and there can be no assurance as to the outcome of any proceedings that may be commenced against it. The exposure associated with any proceedings that may be threatened, commenced or filed against State Street could have a material adverse effect on its consolidated results of operations for the period in which it establishes a reserve with respect to such potential liability or upon its reputation.

[Emphasis added].

31. On this news, shares of State Street fell $3.88 per share, or over 5.6%, over two trading days to close at $64.73 per share on December 18, 2015, damaging investors.

32. On January 27, 2016, before market hours, State Street issued a press release entitled "State Street Reports Fourth-Quarter 2015 GAAP-Basis EPS of $1.34 on Revenue of $2.5 Billion; Full-Year 2015 GAAP-Basis EPS of $4.47 on Revenue of $10.4 Billion" revealing that the Company incurred a "pre-tax charge of approximately $17 million" for "interest on the amounts to be reimbursed in connection with our previously disclosed review of amounts we invoiced clients for certain expenses during an 18-year period," and "the cumulative amount to be reimbursed over the review period, totaling approximately $240 million, has been reflected as a liability in our consolidated balance sheet," stating in pertinent part:

**State Street Reports Fourth-Quarter 2015 GAAP-Basis EPS of $1.34 on Revenue of $2.5 Billion; Full-Year 2015 GAAP-Basis EPS of $4.47 on Revenue of $10.4 Billion**

**Fourth-quarter 2015 operating-basis(a) EPS was $1.21, on revenue of $2.6 billion; Full-year 2015 operating-basis EPS was $4.89 on revenue of $10.6 billion**

Wednesday, January 27, 2016 7:00 am EST

**Dateline:**

BOSTON

**Public Company Information:**

NYSE:

STT

US8574771031

BOSTON--(BUSINESS WIRE)--In announcing today's financial results, Joseph L. Hooley, State Street's chairman and chief executive officer said, "Our performance in the fourth quarter reflects the continued challenges presented throughout 2015, including challenging global equity markets, particularly in emerging markets, persistent low interest rates, the strengthening U.S. dollar, and heightened regulatory expectations. We were successful at managing expenses in the quarter in light of the pressure on revenues. In addition, we grew fee revenue in 2015 and achieved strong new business results as evidenced by new asset servicing commitments of approximately $300 billion this quarter and a total of $800 billion in 2015."

* * *

Fourth quarter of 2015 GAAP-basis results included the following notable items:

- $81.5 million pre-tax gain, or $49 million after-tax, related to the final payoff of a commercial real estate loan acquired as a result of the Lehman Brothers bankruptcy.

- **A pre-tax charge of approximately $17 million that reflects our intention to pay clients interest on the amounts to be reimbursed in connection with our previously disclosed review of amounts we invoiced clients for certain expenses during an 18-year period. In addition, the cumulative amount to be reimbursed over the review period, totaling approximately $240 million, has been reflected as a liability in our consolidated balance sheet**, of which $223 million, or $145 million after-tax, relates to periods prior to the 2015 fiscal year and is reflected in the beginning retained earnings balance of our consolidated statement of shareholders' equity as of December 31, 2014. All prior period financial information within this news release and addendum has been revised to reflect the impact of the reimbursement on each prior period presented. See the addendum included with this news release for further information regarding the impact of the reimbursement on prior periods, including a reconciliation of the previously reported financial results to the revised financial results presented in this news release and addendum.

[Emphasis added].

33. On this news, shares of State Street fell $4.02 per share, or over 7.1%, from its previous closing price to close at $51.91 per share on January 27, 2016, damaging investors.

34. On April 5, 2016, *Reuters* published an article entitled "Ex-State Street executives charged in U.S. for defrauding clients" stating that "U.S. prosecutors announced charges on Tuesday against two former State Street Corp executives for scheming to defraud six clients, including Irish and British government pension funds, through secret commissions on billions of dollars of trades," stating in pertinent part:

> CREDIT RSS | Tue Apr 5, 2016 | 12:16pm EDT
>
> **Ex-State Street executives charged in U.S. for defrauding clients**
>
> By Nate Raymond
>
> **U.S. prosecutors announced charges on Tuesday against two former State Street Corp executives for scheming to defraud six clients, including Irish and British government pension funds, through secret commissions on billions of dollars of trades.**
>
> Ross McLellan, a former State Street executive vice president, was arrested on charges including securities fraud and wire fraud contained in an indictment filed in federal court in Boston, where the custody bank is based.
>
> The indictment also charged Edward Pennings, a former senior managing director at State Street who worked in the bank's London office.

McLellan, 44, was arrested in Hingham, Massachusetts, where he lives. Pennings, 45, is believed to be living overseas and was not arrested, prosecutors said.

* * *

The case followed a 2014 settlement between State Street and the UK Financial Conduct Authority in which the bank paid a fine of £22.9 million (about $37.8 million) for charging the six clients "substantial mark-ups" on certain transitions.

State Street said in a statement that it has been cooperating with the U.S. investigation, and has "significantly strengthened" the controls and reporting mechanisms within the U.K. business unit at issue.

**According to the indictment, McLellan, Pennings and others conspired from 2010 to 2011 to add secret commissions to fixed income and equity trades performed for the six clients of a unit of the bank.**

That unit helps institutional clients move their investments between asset managers or liquidate large investment portfolios, prosecutors said.

"With each trade, they chipped away at the savings of thousands of retirees whose pensions they were charged with safeguarding," Boston U.S. Attorney Carmen Ortiz said in a statement.

The commissions came on top of fees the clients agreed to pay and despite written instructions to the bank's traders that the clients should not be charged trading commissions, prosecutors said.

The clients affected included Irish and British government pension funds and a Middle Eastern sovereign wealth fund, the indictment said.
McLellan and Pennings took steps to hide the commissions, prosecutors said. They said the scheme was discovered after one client inquired in 2011 whether it had been overcharged.

The case is U.S. v. McLellan, U.S. District Court, District of Massachusetts, no. 16-cr-10094.

[Emphasis added].

35. On this news, shares of State Street fell $1.19 per share, or over 2%, from its previous closing price to close at $57.61 per share on April 5, 2016, damaging investors.

36. On January 18, 2017, the U.S. Department of Justice announced that State Street entered into a deferred prosecution agreement and agreed to pay a $32.3 million criminal penalty to resolve charges that it engaged in a scheme to defraud a number of the bank's clients by secretly applying

commissions to billions of dollars of securities trades. State Street also agreed to offer an equal amount as a civil penalty to the SEC, equaling an aggregate settlement of more than $64 million. State Street admitted the allegations and agreed to a deferred prosecution agreement that requires it to employ an independent corporate compliance monitor for three years.

37. On this news, shares of State Street fell $1.46 per share, or over 1.8%, over two trading days to close at $78.74 per share on January 19, 2017, damaging investors.

38. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

39. Scenter can be inferred from the fact that in the Deferred prosecution agreement Defendants admitted to culpability for fraud against their transition management clients. Scienter can also be inferred from the fact that according to the Massachusetts Administrative Complaint, an executive of State Street was informed that State Street overcharged Swift Fees in 2009.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired State Street securities publicly traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, State Street securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs has no interests antagonistic to or in conflict with those of the Class.

44. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of State Street securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- State Street securities are traded in efficient markets;

- the Company's securities were liquid and traded on average in excess of 2.8 million shares per day during the Class Period;
- the Company traded on the NYSE, and was covered by several dozen analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased and/or sold State Street securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

47. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**

**Against State Street**

49. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

50. This Count is asserted against the Company and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51. During the Class Period, the Company directly or indirectly, disseminated or approved the false statements specified above, which it knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52. The Company violated §10(b) of the 1934 Act and Rule 10b-5 in that it:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of State Street securities during the Class Period.

53. The Company acted with scienter in that it knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

54. As a result of the foregoing, the market price of State Street securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual

Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of State Street securities during the Class Period in purchasing State Street securities at prices that were artificially inflated as a result of the Company's false and misleading statements.

55. Had Plaintiffs and the other members of the Class been aware that the market price of State Street securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased State Street securities at the artificially inflated prices that they did, or at all.

56. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

57. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of State Street securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**

**Against The Individual Defendants**

58. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

60. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

61. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of State Street securities.

62. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

63. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 21, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Jonathan Stern
Laurence M. Rosen (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
Joshua Baker
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: 212.686.1060
Fax: 212.202.3827
Email: lrosen@rosenlegal.com

Counsel for Plaintiffs

# CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 21, 2017.

/s/ Jonathan Stern______
Jonathan Stern